**Lisa A. DAUGHERTY, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

2013–SC–000764–MR

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

Counsel for Appellant: Alec G. Stone, Stone Law Office, 469 East Broadway Street, PO Box 487, Brandenburg, Kentucky 40108, Harry Bernard O'Donnell IV,

Watterson West Office Building, 1941 Bishop Lane, Suite 706, Louisville, Kentucky 40218–1937

Counsel for Appellee: Jack Conway, Attorney General, Christian Kenneth Ray Miller, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky 40601

OPINION OF THE COURT BY
JUSTICE NOBLE

The Appellant, Lisa A. Daugherty, shot and killed her husband, Will Phelps. She was convicted of murder and of tampering with physical evidence for hiding the gun used in the shooting. She claims the trial court erred by keeping her from testifying that her husband was a felon, and thus could not legally possess the gun, and that her husband made various statements leading up to and at the time of the shooting. These errors, she claims, undermined her ability to present a cogent defense and thereby infringed her right to due process of law. This Court agrees, and reverses her convictions.

## I. Background

Lisa Daugherty and Will Phelps had been a couple for about twelve years, having been married the last year and a half of that period. They lived together in a trailer on a Breckinridge County farm owned by Daugherty's aunt, Joyce Basham, whom they helped with chores in lieu of paying rent.

On November 5, 2010, Daugherty and Phelps were home at the trailer. Phelps had been drinking whiskey. That afternoon, they had an argument over putting a bale of hay out and at some point a gun was produced, possibly by Phelps.

Though Daugherty told several different stories of what then happened, she would eventually claim that Phelps laid the gun down and left the room, at which point she hid the gun because she was afraid. She claimed that on his return, he demanded the gun back and threatened to kill Daugherty's dog if she did not give it back to him. Though she feared for her life, she claimed, she nevertheless began to give the gun back but did not release it when Phelps grabbed it. A struggle ensued. Daugherty claimed that her finger slipped to the trigger and that something, possibly Phelps's thumb, pushed her finger. The gun discharged, shooting Phelps in the abdomen.

Rather than calling an ambulance, Daugherty and Phelps got in a car to drive to the hospital. Daugherty claimed Phelps was conscious and bleeding but that he walked himself to the car, where he leaned the seat back and stuck his feet out the window. Daugherty later claimed that Phelps complained that the gun could not be taken to the hospital because it would get him in trouble, given his convicted-felon status, and that he ordered her to throw the gun out of the car. A short distance from the trailer, Daugherty stopped the car, got out, and hid the gun near a fence post.

The evidence conflicted as to the time of their departure from the trailer. Daugherty claimed it was around 4:00 p.m. A prosecution witness, however, testified to seeing Daugherty, allegedly a normally fast driver, slowly driving the car, with a pair of tan military boots sticking out from the passenger-side window, on the road near the trailer around 3:30 p.m. Another witness testified to seeing Daugherty driving the car around 3:50 p.m. about a mile from town; the car was headed in the direction of the hospital but did not appear to be making any attempts to bypass traffic. The times were important because the trailer was only 8.2 miles from the hospi-

tal, and it took only about 13 minutes to travel that distance without exceeding the speed limit. Daugherty and Phelps arrived at the Breckinridge Memorial Hospital at around 4:16 p.m.

Phelps was pronounced dead around 5:58 p.m. An autopsy revealed that he died from the single gunshot wound. It also revealed that he had a vitreous alcohol concentration of .021%, which the medical examiner testified was equivalent to approximately half of a drink.[1] THC metabolites and therapeutic levels of alprazolam (also known as Xanax) were found in his blood. The medical examiner testified that fluid given to Phelps during his medical treatment would have diluted these drugs to the levels eventually detected.

While at Breckinridge Memorial, Daugherty told different stories of how Phelps was shot.

She first told a nurse that Phelps had been cleaning his gun when he accidentally shot himself. The nurse would later testify that Daugherty was calm at the time.

Officer Justin Mangus[2] also spoke with Daugherty. He noted that she was upset and crying, though he could not later recall if he saw any tears. Daugherty told him that Phelps's gun had been jammed, that he had been "messing with the gun," and that he had gone into another room when she heard a gunshot. Daugherty told another police officer at the hospital that Phelps had been un-jamming his gun when he shot himself.

Deputy Sheriff Jim Beechum next spoke with Daugherty at the hospital. She told the deputy that she had been in the bathroom and that Phelps had been in the bedroom with the gun. Beechum asked her to write out a short statement of what happened, which she did. She did not say in her written statement that Phelps had been cleaning the gun, or that he had been working to un-jam the gun. She claimed she heard the shot while she was in the bathroom, and that Phelps was bleeding when she went back to the bedroom. She told Beechum that the gun was in the bedroom, and that she might have picked it up. (The gun, of course, was not in the bedroom, or anywhere else in the trailer.)

Deputy Jerry Cundiff also spoke with Daugherty. She told him that she had picked up the gun but dropped it because it was too hot. She first told him that the gun was at the trailer, then that it was in the car, and finally that it could be on the side of the road somewhere between the trailer and the hospital. She eventually asked him if she could speak with Sheriff Todd Pate, whom she had known for many years.

Sheriff Pate interviewed Daugherty at his office later that day. She was given her *Miranda* rights, and the ensuing interview was recorded (and later played for the jury). She claimed that Phelps had been berating her and drinking heavily for days, and that he was very drunk, though not slurring his speech or staggering, when the struggle over the gun occurred. She claimed Phelps threatened to kill her, that she hid his gun, and that he threatened to kill her dog if she did not return the gun. She claimed Phelps came toward her, saying he was going to kill her, and that she began to hand him back the gun but changed her mind. The two struggled over the gun, and her finger went to the

1. A blood alcohol test showed no alcohol. The medical examiner, however, testified that because of medical procedures that had been performed on Phelps, the blood test was not an accurate representation of his blood alcohol concentration at the time of the shooting.

2. By the time of trial, Mangus was no longer a police officer.

trigger. She stated that Phelps's left thumb also got on the trigger, and that as they continued to struggle, Phelps said that she was not brave enough to kill him, which she conceded to him. She claimed that Phelps then said that if she wanted to kill him, she should go ahead and do it; he then pushed her finger on the trigger, and the gun went off.

She claimed that Phelps did not fall, and instead pulled up his shirt to show blood running down his body. Phelps walked to the car, and one of them (she could not remember who) carried the gun there. As they drove down the driveway, Daugherty asked Phelps if they needed to take the gun to the hospital because it might need to be seen to treat his wound. She claimed that Phelps instead told her to throw the gun out the window so they would not get in trouble for having it (both were convicted felons). She claimed she stopped the car, got out and put the gun near a fence, and kicked some grass over it. She stated that Phelps was conscious the whole way to the hospital. She also claimed that she initially lied about what happened because she was scared of Phelps, and had been for many years. She also stated that she knew Phelps was not supposed to have the gun, which he had gotten from "some guy," and that he had shot the gun near her before.

Police eventually found the gun near a fence post about 50 yards from the trailer. The gun's serial number had been removed, though there is no indication that Daugherty had anything to do with that.

Daugherty was indicted for murder and tampering with physical evidence. She was tried in August 2012, but the jury was unable to reach a verdict, resulting in a mistrial.

At a second trial, the jury convicted her of both counts, finding her guilty of murder under an aggravated-wantonness instruction.[3] She was sentenced to 25 years in prison. She appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

On appeal, Daugherty alleges three primary errors: (1) that the trial court erred by not allowing her to testify about Phelps's prior felony conviction; (2) that the trial court erred in not allowing her to testify about statements she claimed Phelps made while they allegedly struggled over the gun; and (3) that the trial court erred by allowing the prosecutor to question Joyce Basham about a "bloody coat" that may have been related to the killing. In addition to these claims of error, Daugherty makes general claims that any error cannot be harmless because the first trial had been a close one, having resulted in a deadlocked jury, and that there was cumulative error.

### A. The trial court erred in excluding Phelps's prior felony conviction.

■ Daugherty's first claim of error is that the trial court erroneously prevented her from testifying that Phelps had a prior felony conviction, though evidence of that conviction was admitted at the first trial. Before trial, Daugherty's counsel moved to have Phelps's felon status admitted under KRE 404(b), that is, as evidence of Phelps's prior bad acts offered not to show action in conformity therewith but for another purpose. In a written memorandum, trial counsel argued that the evidence was relevant both "to her defense of Tampering with Psychical [sic] Evidence (placing the gun in the grass) as well as the Murder charge (to defend the accusa-

---

**3.** The jury was not instructed on intentional murder.

tion that she intentionally shot her husband and as a result was hiding evidence)."

In the course of discussing the admissibility of this evidence, the prosecutor noted that the relevance of Phelps's conviction depended on whether he had commanded Daugherty to get rid of the gun (as she claimed), which he claimed was inadmissible hearsay. The trial court agreed that the statement would be inadmissible hearsay and that the felon status was therefore also inadmissible. The court noted that KRE 609 was not a basis for admitting the conviction, since Phelps could not testify and be impeached.

Later, after the prosecution had played the recorded interview, in which Daugherty claimed Phelps ordered her to throw the gun out of the car, the trial court revisited the ruling on that statement, concluding that the door had been opened and that she could testify about it. Nevertheless, the court again declined to allow any testimony about why Phelps would have wanted the gun hidden, including his felon status. Daugherty did eventually testify that Phelps told her to throw the gun out, but she did not explain that this was because he was a felon.

On appeal, Daugherty again claims that the conviction evidence would have supported and explained her testimony that she hid the gun beside the fence post at Phelps's direction, rather than because she believed she was culpable for the shooting. This, presumably, would have undermined any inference of her consciousness of guilt of murder that could be derived from her hiding the gun. She also claims this would have supported her testimony that she initially lied to the police to protect Phelps from a gun-possession charge. Thus, she claims, the proof was essential to her defense to both the murder and tampering charges.

The Commonwealth responds by arguing that Daugherty is procedurally barred from arguing that this testimony had anything to do with her defense to the murder charge because her counsel orally argued at trial that it went *only* to the tampering charge. And as it relates to the tampering charge, the Commonwealth argues, among other things, that the testimony would not have amounted to a defense as it was an admission to the charged offense, that is, it was an explanation for why she tampered with physical evidence that did not amount to a defense.

The Commonwealth's procedural-default claim is without merit. Though defense counsel stated during argument to the trial court that the conviction related only to the tampering charge, the written memorandum submitted to the court clearly states it was also related to the murder charge. And though in the course of arguing defense counsel stated, for example, that this evidence went "to the tampering charge, nothing else," he did so in an attempt to show that he was not offering it as a direct defense to the murder charge, having noted just before that "it really is not related to the shooting or what happened at the shooting." But that is a correct statement: Phelps's felon status had nothing directly to do with the shooting. Rather, it was indirectly related to that offense to the extent that the prosecution intended to use Daugherty's act of hiding the gun to support an inference of her guilt of the murder.

Indeed, this is why a few moments after stating that this proof was only about the tampering charge, defense counsel noted that the case was all about Daugherty having lied about the gun, which he then claimed was what led the case to be prosecuted as a murder. At that time, he also complained that if he could not introduce the evidence, then the only conclusion the

jury could draw from Daugherty's having hid the gun was that she intentionally shot Phelps.

Though defense counsel may have chosen his words injudiciously at times, suggesting that the evidence went only to the tampering charge when he meant it went to the circumstances giving rise to the tampering charge (but which, in turn, tended to support the murder charge), there is little question that he believed Phelps's felon status was relevant to the murder charge, albeit indirectly. Daugherty is not trying to feed this court a "different can of worms" than was fed to the trial court, *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976); instead, she is expanding on arguments that were made to the trial court. The two claims are not mutually exclusive.

The question, then, is whether Phelps's felon status was admissible. The most basic rule of evidence is that "[a]ll relevant evidence is admissible." KRE 402. Relevant evidence is inadmissible only "as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky." *Id.* As we have repeatedly noted, this gives the Rules of Evidence "an inclusionary thrust." *Perry v. Commonwealth*, 390 S.W.3d 122, 132 (Ky.2012).

Daugherty claimed that Phelps's felon status was relevant because it was the reason he ordered her to hide the gun (since he did not want to be caught illegally possessing it). Of course, the relevancy of this fact turned on Daugherty's also being able to get Phelps's statement admitted. The felon status was therefore conditionally relevant, if at all. *See* KRE 104(b) (discussing conditional relevancy).

The prosecutor claimed the statement was inadmissible as hearsay, and the trial court initially agreed. But the court ultimately allowed testimony about this condition of fact (that is, testimony that Phelps ordered Daugherty to hide the gun), though it did so only because the prosecution had opened the door by playing for the jury the recorded interview.

■ But the simple fact is that the prosecutor and trial court were incorrect; Phelps's statement was not barred by the hearsay rule. *Hearsay* does not mean any or all out-of-court statements; rather, *hearsay* means only "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). And a statement consisting of a command to another person is not offered for the truth of the matter asserted. *See United States v. Bellomo,* 176 F.3d 580, 586 (2d Cir.1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); *United States v. Thomas,* 451 F.3d 543, 548 (8th Cir.2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay.").

■ Instead, a command, like a threat or a question, is a verbal act. *See White v. Commonwealth,* 5 S.W.3d 140, 141 (Ky. 1999) (noting the command "wait, don't leave me," as a "prime illustration of this usage"). The significance of the statement comes not from that which is asserted— the declarant's desire that the person carry out the commanded act[4]—but from the

4. Of course, to the extent that this aspect of the statement would fall under the general

hearsay rule, it would be subject to the excep-

making and hearing of the statement. " 'Instructions to an individual to do something are ... not hearsay,' because they are not declarations of fact and therefore are not capable of being true or false." *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir.1994) (quoting Graham, *Federal Practice and Procedure: Evidence* § 6705 at 409); *see also United States v. Gibson*, 675 F.2d 825, 834 (6th Cir.1982) (holding that an order "was not hearsay under Federal Rule of Evidence 801(c): it was not offered to show that the substance of [the] utterance was either true or false. . Indeed, a suggestion or an order is not subject to verification at all because such utterances do not assert facts."). And that Daugherty was given a command was relevant to prove her state of mind, that is, why she acted as she did, which is a non-hearsay use. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.05[2][e], at 567 (5th ed. 2013) ("The mere making of a statement may be relevant to prove the state of mind of the person who heard the statement.").

■ And Daugherty's state of mind was relevant to her defense to the murder charge. As this Court has stated, "attempts to conceal evidence ... create an inference of guilt." *Davis v. Commonwealth*, 147 S.W.3d 709, 730 (Ky.2004). When a defendant is shown to have hidden or destroyed evidence, that fact shows the defendant's consciousness of his or her own guilt. Here, proof that Daugherty hid the gun after the shooting, when considered in a vacuum, would support an inference that she knew she was guilty. This, in turn, would have allowed the prosecution to assert that she intentionally shot her husband and hid the gun to cover her tracks, which would undermine her claim that the shooting was accidental. The evidence that Phelps was a felon and thus

had a substantial motive to avoid being found in possession of the gun, along with his order to Daugherty to hide the gun, however, would give context to her actions and have at least some tendency to undermine the inference of guilt.

The Commonwealth argues that the proof nevertheless was not a defense to the murder charge because all Daugherty's statements implicated her husband by placing the gun in his possession, and that it would be very easy for the police to then discover his felon status. To some extent, this is a non sequitur. Whether Phelps was guilty of illegally possessing a handgun had nothing to do with whether Daugherty accidentally or intentionally shot him. The only question is whether it might have led him to order Daugherty to hide the gun, which would show that she hid the gun for that reason and, in turn, undermine to some degree the inference of guilt of murder that could be discerned from her having hidden the gun. If anything, the Commonwealth's argument goes to the weight of the evidence, not its admissibility.

The Commonwealth also argues that any value of this evidence to Daugherty's defense was negated by the fact that she, too, was a convicted felon, and because the gun's serial number had been illegally removed. Again, this goes to the weight of the evidence, not its admissibility.

The trial court and lawyers appear to have been under the misapprehension that they had to proceed under some particular rule concerning convictions before Phelp's status could be introduced. Thus, Daugherty's counsel cited KRE 404(b) as grounds for admission of Phelps's felon status, and there was substantial discussion (and proper rejection) of KRE 609 as a possible basis for its admission. But

tion for statements of the declarant's then-existing state of mind under KRE 803(3).

that is the wrong inquiry. Given the inclusionary thrust of the rules and a basic showing of relevancy, the evidence may be excluded only if there is a rule barring its admission. Yes, there are limits on the use of felony convictions under some circumstances (KRE 609 contains a substantial one for when the conviction is being used for impeachment purposes), but none have been identified here.

The Commonwealth notes that the right to present a meaningful defense does not "necessarily extend to showing the victim had a criminal record." This is correct as far as it goes. There is no absolute right to introduce Phelps's status as a felon. At the same time, there was no need to find a specific rule to justify wedging Phelps's felon status into the case; its admission was justified by a showing of relevancy. At that point, it was properly admissible absent another rule barring its admission. Indeed, the cases the Commonwealth cites showing a lack of an absolute right to introduce such evidence held the evidence inadmissible for want of *relevancy*, not some other deficiency. *See, e.g., Malone v. Commonwealth*, 364 S.W.3d 121, 128 (Ky. 2012) (approving trial court's disallowing of such evidence "as irrelevant").

Thus, under the ordinary framework of the evidentiary rules, evidence of Phelps's felon status was relevant and, absent some other rule barring it, admissible. The Commonwealth has not identified another rule that would bar its admission. There is little question it would satisfy the probativeness-vs.-prejudice analysis required by KRE 403. The other rule that commonly implicates a person's status as a felon, KRE 609, had no applicability here because Phelps was not a witness and the proof was not offered as impeachment. Nor would KRE 404(b) bar evidence of Phelps's felony conviction because it was not being offered as evidence of his charac-

ter or criminal disposition or acts in conformity therewith. That he was a convicted felon was offered only to show his legal incapacity to possess a gun because of his status as a felon, as part of a larger explanation for why he ordered Daugherty to hide the gun.

 Thus, this evidence was admissible. The question, then, is whether the trial court erred in refusing to admit it. Trial courts enjoy substantial discretion in admitting or excluding evidence at trial. Indeed, there are many instances where a trial court will not err regardless of whether the evidence is admitted or excluded because of this broad discretion. Such decisions "are not disturbed on review in the absence of an abuse in discretion." *Major v. Commonwealth*, 177 S.W.3d 700, 710 (Ky.2005). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

Here, the trial court did not exclude the evidence based on sound legal principles. The trial court initially declined to admit the proof based on an erroneous understanding of the hearsay rules, as described above, and ultimately refused to admit the felon status because of a mistaken belief that such proof had to fit under a specific rule governing felony convictions, rather than the general inclusionary rule of relevancy. In so doing, it misapplied the relevant legal principles to the case. That constitutes an abuse of discretion and was error.

**B. The trial court abused its discretion in preventing Daugherty from recounting statements allegedly made by Phelps just before, during, and after the shooting.**

■ At trial, Daugherty also sought to introduce, through her own testimony, various statements that she claimed Phelps made leading up to and during the struggle over the gun and as they went to the hospital. Daugherty's brief does not identify the precise statements she wished to admit, though defense counsel made clear to the trial court that he wished to ask Daugherty about the statements that had already been admitted in the recorded interview. The Commonwealth, in its brief,[5] identifies the following statements that were admitted in the first trial as the likely suspects:

(1) "Where'd the gun go?" and "Well, give me the gun back."

(2) That he was going to hurt or kill the dog if she did not give the gun back.

(3) "If you want to shoot me, just shoot me," and that she did not have the guts to shoot him.

(4) "I'm gonna kill you."

(5) That after being shot, he said, "No, I don't want to get blood on the seat," and asked her to get a sheet for him to sit on.

(6) That he was having trouble breathing as they drove to the hospital.

(7) That they could not take the gun to the hospital and that she should throw the gun out the window.[6]

(8) That he was a convicted felon and was not supposed to have a gun.

Versions of most of these statements had already been admitted in the second trial in the Commonwealth's case-in-chief. Specifically, most of these statements had been made to Sheriff Pate in his interview of Daugherty, a recording of which was played for the jury.

When Daugherty took the stand in her own defense, her counsel attempted several times to inquire about what Phelps had said to her, seeking, in essence, to elicit the statements recounted above. The prosecutor objected, and defense counsel argued that the statements had already been admitted by way of the recorded interview. Nevertheless, the trial court declined to allow defense counsel to ask about what Phelps had said, noting that it was distracting to the jury and that no more hearsay was to be admitted (and noting that a lot of hearsay had already been allowed in).

Daugherty claims these statements were admissible for three reasons: (1) they had been admitted in the first trial, and the law-of-the-case doctrine required their admission at the second trial; (2) they fell under the state-of-mind hearsay exception under KRE 803(3); and (3) the prosecution had opened the door to them by playing the recorded interview.

■ Daugherty's argument that because the statements were admitted in the first trial means they should have been admitted in the second trial under the law-of-the-case doctrine is not well taken for multiple reasons. First, it appears that there was no objection to this testimony at the first trial, and thus no trial court ruling to be applied in subsequent proceedings. Second, and more importantly, "[a]s applied in Kentucky, the law of the case doctrine applies only to rulings by an appellate court and not to rulings by a trial court." *Dickerson v. Commonwealth,* 174 S.W.3d 451, 466–67 (Ky.2005). Daugherty concedes that this is the law in Kentucky but urges the Court to adopt the "more

---

**5.** In her reply brief, Daugherty agrees that these are the statements she wished to admit.

**6.** As noted above, Daugherty was actually allowed to testify as to these statements. And, again as discussed above, they were properly admissible.

liberal view of the doctrine" arguably applied in other jurisdictions and thus to "appl[y] it to trial court rulings." *Id.* As in *Dickerson,* this Court declines to join those jurisdictions. *Id.*; *cf. JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats,* 424 S.W.3d 902, 909 (Ky.2014) ("Until a final judgment is entered, all rulings by a court are interlocutory, and subject to revision.... Indeed, efficient judicial process mandates that a trial court correct an erroneous ruling before finality when possible. There is an expectation that trial courts will apply the correct law to matters before it. Certainly, if a court believes before finality that it has made an error in the law, it is incumbent upon the court to correct the matter.").

■ Next, Daugherty argues that the statements were admissible under the state-of-mind hearsay exception. KRE 803(3) states that the prohibition on hearsay shall not exclude "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Several of Phelps's statements—such as that he did not want to get blood on the car seat and was having trouble breathing—clearly fit this exception. They were statements of his mental state or physical condition at the time.

Several of the other statements—such as his question about the location of the gun, the orders that Daugherty should give the gun back and that she should just shoot him, and the threat that Phelps was going to kill her—were not even hearsay. As discussed above, questions, orders, and threats are not hearsay. *United States v. Bellomo,* 176 F.3d 580, 586 (2d Cir.1999); *United States v. Thomas,* 451 F.3d 543, 548 (8th Cir.2006). "[T]hey are not declarations of fact and therefore are not capable of being true or false." *United States*

*v. Reilly,* 33 F.3d 1396, 1410 (3d Cir.1994) (quoting Graham, *Federal Practice and Procedure: Evidence* § 6705 at 409). In essence, such "statements" contain no assertion. They, therefore, are not offered to prove the matter asserted and are not hearsay.

Interestingly, the Commonwealth does not now challenge this evidence on the ground that it was properly excluded by the hearsay rule. Instead, the Commonwealth argues that Daugherty has failed to explain how KRE 803(3) applies to each statement, and that this claim should be treated as procedurally barred and summarily denied. The Commonwealth notes that the argument on this point in Daugherty's brief consists only of two paragraphs and a string citation, and claims therefore that it "does not comport with CR 76.12(4)(c)(v)'s requirement that an appellant make an argument."

This argument is not well taken at all. Brief writing and appellate advocacy in general, like many areas of the law, are difficult. Of course, courts wish that every brief was succinct, readable, interesting, and persuasive. As one noted authority has stated: "In law, the quality of writing matters. Good writing can win marginal cases, and bad writing can lose good ones." Bryan A. Garner, *The Winning Brief,* at xxvi (3d ed.2014). But courts must also operate in the real world. And the business of "[p]ersuasion is a complicated matter." *Id.* at xiii.

That a portion of a brief may be inartful is not grounds for summarily dismissing the claim presented therein. Such a ruling would set a dangerous precedent for litigants on both sides. Indeed, if that were the rule, many arguments would be treated as waived and lost. As long as a good faith effort is made, this Court will consider the arguments presented to it, as it

often has done on behalf of the Commonwealth as well as defendants.

Alternatively, and again without resort to the hearsay rules, the Commonwealth argues that the trial court acted properly in preventing Daugherty from recounting her husband's statements because they would have been needlessly cumulative. in violation of KRE 403 after having been admitted in the prosecution's case. KRE 403 gives trial courts the discretion (and, in some instances the duty) to limit the admission of relevant evidence under certain circumstances, namely, where the "probative value is substantially outweighed by" various harmful effects, including "considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Though the trial court did not expressly cite this rule, it was evidently part of the decision to exclude this evidence, the express rationale for which was to avoid distracting the jury and avoid admission of further hearsay.

But the purpose of these delay and needless-presentation-of-cumulative-evidence "considerations," as the rule terms them, is "to provide trial courts with the discretion that is needed to control tireless litigators and conduct trials efficiently." Lawson, *supra*, § 2.15[4][b], at 98. They are not aimed at protecting either side from prejudice or upholding fairness; rather, they "are designed to conserve judicial resources." *Id.* at 98–99 n.62 (quoting Paul C. Giannelli, *Understanding Evidence* 129 (3d ed.2009)). Indeed, trial courts should "act with caution when excluding relevant evidence under KRE 403, . . . [a]nd when exclusion is to be grounded in a 'needless presentation of cumulative evidence,' there is probably a need for special caution." *Id.* at 99.

It is worth noting that under KRE 403, in a converse factual scenario, we have previously approved the admission of a recording after a witness had already testified to events captured on the recording, holding that such proof was not needlessly cumulative. *See Pollini v. Commonwealth,* 172 S.W.3d 418, 423 (Ky.2005). That, of course, does not necessarily mean the trial court erred in this case, as each judge will necessarily, and properly, exercise discretion under the rule differently. At the same time, however, "that discretion is not unlimited." *Brock v. Commonwealth,* 947 S.W.2d 24, 29 (Ky.1997).

The claim that Daugherty's testimony would have been needlessly cumulative because the evidence had already been admitted—by the Commonwealth—is simply untenable. Such an approach would require a defendant to stand on the Commonwealth's evidence in many cases. A canny prosecutor could anticipate the accused's case and preemptively admit evidence, in a manner favorable to the state, so as to strip the accused of any meaningful ability to mount a defense.

But one of the most fundamental aspects of our criminal justice system is the defendant's right to present her own defense. We have an adversary system of justice. The prosecutor is not there as an adjunct to the court to marshal the evidence, as in an inquisitorial system, thereby leaving the accused to stand by at his mercy. The defendant is allowed to actively defend the case, which includes the right to put on evidence. The courts have the power to limit needlessly cumulative evidence within the context of a defendant's case, but she still has the right to make one. Even "in using KRE 403's empowerment to exclude cumulative evidence, trial judges must leave litigants with the flexibility to produce the most convincing case they have." *Id.*

That the prosecution, as in this case, has already admitted statements

does not render a repetition of those statements in the defense's case needlessly cumulative. "We note that '[n]ot all evidence that is duplicative is therefore cumulative, and evidence should not be excluded on this ground merely because it overlaps with other evidence.'" *Doneghy v. Commonwealth*, 410 S.W.3d 95, 109 (Ky.2013) (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4.15 (3d ed.2012)).

And some repetition is no doubt helpful for a jury. "Multiple witnesses bring multiple viewpoints and 'testimony from multiple sources about the same event is likely to differ in ways that are helpful to the factfinder.'" *Id.* (quoting Mueller & Kirkpatrick, *supra*, § 4.15). This is especially the case when the repetition comes from the defendant. The statements have a different context when coming directly from the mouth of the defendant as she makes her defense than they do when coming from other witnesses or even recordings of the defendant being questioned by police. And in that context, they can have more force and, perhaps more importantly, can be explained and expanded on, whereas when presented by, and no doubt in a light favorable to, the prosecution, the accused has no say beyond the limited tool of cross-examination.

The statements in question were necessary to present a full picture of Daugherty's version of what happened. Without being able to repeat her husband's threats and commands that she kill him, among other things, Daugherty could only describe what she did and what she saw her husband do. But those statements provided important context for those actions, showing that they occurred in the midst of her husband's belligerence while he strug-

gled with her over a loaded gun. Indeed, in reviewing the testimony, Daugherty's account is inherently ambiguous, disjointed, and incomplete. She was forced to jump from place to place in the sequence of events as she skipped over some of the most important parts of what she claimed occurred—the conversation leading up to and overlying the struggle with the gun. Had she been allowed to discuss these statements, she could have better explained how the shooting was accidental.

That the jury heard these statements in her recorded interview with the sheriff was not enough. Just as she had the right to take the stand and testify, so too did she have the right to tell her whole story. If the statements were otherwise admissible—and, as discussed above, they were, being relevant and not barred by the hearsay rule—she should have been allowed to incorporate them into her testimony.

To put it simply, "[e]xclusion of this evidence on grounds that it was cumulative was outside the discretion normally exercised by a trial judge in performing the KRE 403 balancing test." *Brock*, 947 S.W.2d at 29. There was no danger of wasting judicial resources by admitting this evidence a second time, and Daugherty was not a relentless litigant in need of reining in. This Court concludes that the trial court abused its discretion in preventing Daugherty from testifying to the statements allegedly made by her husband.[7]

**C. These errors infringed Daugherty's right to due process of law and were not harmless.**

The remaining question is whether the errors described above require reversal of Daugherty's convictions, or can instead be harmless under Criminal Rule

---

7. Having resolved Daugherty's claim in this manner, we do not address her argument that the Commonwealth "opened the door" and that the statements were admissible under the curative-admissibility rule.

9.24 and KRE 103(a). Ordinarily, we review each error individually to determine whether it sufficiently prejudiced the defendant to require reversal. Here, however, the errors in excluding evidence about the victim are related to each other. Both go to Daugherty's ability to present a full defense to the charges. As such, they are considered together.

The harmless-error rules bar reversal of a conviction "unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." RCr 9.24. "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." *Id.*; *see also* KRE 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). Ordinarily, an "evidentiary error . . . is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Harris v. Commonwealth*, 384 S.W.3d 117, 125 (Ky.2012). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky.2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (alteration in original).

But these were no mere evidentiary errors. Daugherty has alleged that they so undermined her right to present a defense as to infringe her right to due process of law. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "This right, often termed the 'right to present a defense,' is firmly ingrained in Kentucky jurisprudence, and has been recognized repeatedly by the United States Supreme Court." *Beaty v. Commonwealth*, 125 S.W.3d 196, 206 (Ky. 2003) (citations omitted). Of course, not all evidentiary errors implicate the constitution. But "[a]n exclusion of evidence will almost invariably be declared unconstitutional when it 'significantly undermine[s] fundamental elements of the defendant's defense.'" *Id.* at 206–07 (quoting *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)) (alteration in original). As this Court has noted: "It is crucial to a defendant's fundamental right to due process that he be allowed to develop and present any exculpatory evidence in his own defense, and we reject any alternative that would imperil that right." *McGregor v. Hines*, 995 S.W.2d 384, 388 (Ky.1999). "A trial court may only infringe upon this right when the defense theory is unsupported, speculative, and far-fetched and could thereby confuse or mislead the jury." *Beaty*, 125 S.W.3d at 207 (internal citation and quotation omitted).

Here, Daugherty's only defense was that the shooting was accidental. She could not, and did not, disclaim having been involved with it. The Commonwealth, however, painted her as having acted intentionally, in part by offering evidence that she hid the gun after the shooting, took a very long time to get to the hospital, and lied to police at the hospital. This circumstantial proof went a long way to proving that the shooting was not accidental. Daugherty's inability to explain why she hid the gun or to repeat the statements she claimed her husband made just before and during the struggle over the gun left her version of events incomplete and disjointed. Her account of the shoot-

ing obviously rang hollow to the jury that convicted her. Because she could not present this evidence, Daugherty was unable to present a complete picture of what happened and could not fully explain how the shooting was instead an accident. Though not completely absent, her defense was at least hobbled—and substantially so.

Thus, this Court agrees that the trial court's evidentiary errors implicated Daugherty's due-process right to make a defense. Her theory was not completely far-fetched or unsupported by the evidence. And the prior jury that considered the omitted evidence could not reach a verdict. She should have been allowed to present this exculpatory proof.

■■■ Because the errors thus have a constitutional dimension, the standard for finding the errors to be harmless is much higher. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Brecht v. Abrahamson,* 507 U.S. 619, 622, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("[T]he standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.'"). This requires "prov[ing] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. And "[t]he State bears the burden of proving that an error passes muster under this standard." *Brecht v. Abrahamson,* 507 U.S. at 630, 113 S.Ct. 1710.

■■ Under this standard, the errors were not harmless. This was a close case at trial, turning on whether Daugherty acted accidentally, with circumstantial proof being used to prove her state of mind. At the first trial, where the evidence in question was admitted, the jury failed to convict. Though that jury also failed to acquit, the difference in result from the first to the second trial is compelling evidence of the effect of the excluded evidence. This shows that the errors were not harmless. *See Crowe v. Commonwealth,* 38 S.W.3d 379, 384 (Ky.2001) (finding prejudicial error, in part, because a "previous trial had, in fact, resulted in a deadlocked jury").[8]

### III. Conclusion

The trial court erred in barring evidence that the victim was a convicted felon and thus had a reason to ask Daugherty to hide the gun used in the shooting. The court also erred in preventing Daugherty from testifying to the victim's threatening, commanding, and questioning statements allegedly made as he struggled with her over the gun, thereby limiting her ability to show that the shooting occurred accidentally in the course of that struggle. These errors hampered Daugherty's due-process right to present a defense, and were not harmless. For these reasons, the judgment of the Breckinridge Circuit Court is reversed.

All sitting. All concur.

8. Because the Court is reversing for Daugherty's first two claims of error, it declines to reach the third claim of error. When reversing for one or more errors, this Court sometimes addresses other raised issues that are likely to recur at retrial. We cannot say the error alleged to have arisen from the questioning of Joyce Basham about the bloody coat is likely to recur at retrial; and even if that issue is revisited, it is unlikely to be revisited in precisely the same way.