# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE ACTION.

RENDERED: OCTOBER 23, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0210-MR

AARON BOWLIN          APPELLANT

V.          ON APPEAL FROM FULTON CIRCUIT COURT
HONORABLE TIMOTHY A. LANGFORD, JUDGE
NO. 22-CR-00108

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Fulton County jury convicted Aaron Bowlin of five counts of sexual abuse in the first degree. The trial court sentenced him to twenty years' imprisonment. He appeals to this Court as a matter of right. KY. CONST. §110(2)(b). Finding no error, we affirm.

### BACKGROUND

In 2022, Bowlin was indicted on three counts of first-degree sexual abuse, victim under twelve years of age; four counts of first-degree rape, victim under twelve years of age; two counts of first-degree unlawful transaction with a minor; and two counts of use of a minor under age sixteen in a sexual performance. The victims of these offenses were N.H. and C.H., the daughters of his former girlfriend, S.H. Around the same time, Bowlin was also indicted on sex offenses against the same victims in neighboring Hickman County. He

was first tried and acquitted in the Hickman County case. Two months later, he was tried in this matter.

Bowlin and S.H. were in a relationship and living together between 2010 and 2014. The offenses occurred in 2013 when N.H. and C.H. were eight and seven years old, respectively. Bowlin and S.H. also have a minor child in common, H.B., and Bowlin has another child, L.B. Despite having no legal or biological relationship to L.B., S.H. sometimes helped care for him even after she was no longer in a relationship with Bowlin. During their relationship, Bowlin, S.H., and the children lived in two residences in Fulton County, both in Hickman, Kentucky: (1) Bowlin's step-grandmother's home on Terrace Drive, and (2) a trailer in a trailer park.

At trial, N.H. testified to two incidents of sexual contact with Bowlin. The first occurred in the trailer. The second occurred in the woods near the Terrace Drive home. C.H. testified to the same incident, stating that Bowlin also touched her sexually in the woods on that day. C.H. also testified to two other incidents. The first occurred in the bathroom of the trailer. The second occurred in the bedroom of the Terrace Drive home. The sisters testified Bowlin threatened to hurt their mother or get them in trouble if they told anyone about his actions.

On cross-examination, defense counsel questioned S.H., C.H., and N.H. about custody issues between S.H. and Bowlin. However, the trial court limited defense counsel's questioning on this matter because she did not lay sufficient foundation of the existence of a custody action. Specifically, the court limited

counsel's questioning of S.H. without copies of the record from the custody action.

Bowlin attempted to call Barak Choate as a witness. He did not disclose Choate as a potential witness prior to trial or during voir dire. However, Choate had been the sole defense witness in the Hickman County trial wherein the same attorneys and trial judge had been participants. The trial court did not allow Bowlin to call Choate. He testified by avowal to a conversation he claimed to have overheard between S.H. and Andrea Hagerty, the Cabinet for Health and Family Services caseworker assigned to the case involving the children.

Bowlin was ultimately convicted of five counts of sexual abuse in the first degree. The jury recommended a sentence of thirty years' imprisonment. The trial court imposed a sentence of twenty years' imprisonment, the maximum allowed by law. The trial court also imposed jail fees at sentencing.

This appeal follows.

## ANALYSIS

On appeal, Bowlin raises the following issues: (1) he was denied his right to present a defense; (2) introduction of victim impact evidence during the merits phase of the trial affected his substantial rights; (3) he was deprived of a unanimous verdict by the jury instructions; and (4) the sentencing court did not have jurisdiction to impose jail fees at the time of his sentencing.

**1. Any error by the trial court regarding admission of evidence relating to Bowlin's defense was harmless.**

Bowlin claims the trial court deprived him of his right to present a defense by (a) refusing to allow him to call Choate as a witness, and (b)

3

restricting his confrontation of the witnesses against him.[1] Both the United States Constitution and the Kentucky Constitution protect a criminal defendant's "right to present a complete and meaningful defense." *Roberson v. Commonwealth*, 694 S.W.3d 272, 280 (Ky. 2024) (citation omitted). "The defendant is allowed to actively defend the case, which includes the right to put on evidence. . . . [T]rial judges must leave litigants with the flexibility to produce the most convincing case they have." *Daugherty v. Commonwealth*, 467 S.W.3d 222, 234 (Ky. 2015) (citation omitted).

When exclusion of evidence "significantly undermine[s] fundamental elements of the defendant's defense[,]" it will likely be deemed unconstitutional. *Newcomb v. Commonwealth*, 410 S.W.3d 63, 85 (Ky. 2013) (footnote omitted). However, "[t]he right to present a defense . . . does not abrogate the rules of evidence." *Roberson*, 694 S.W.3d at 280 (internal quotation marks and citation omitted). So long as a trial court's exclusion of evidence "does not significantly undermine fundamental elements of the defendant's defense," we review the decision for abuse of discretion. *Newcomb*, 410 S.W.3d at 85 (footnote omitted).

First, Bowlin claims he was prevented from presenting his defense when the trial court barred him from calling Choate as a witness. Bowlin argues the

---

[1] We note that much of Bowlin's argument on this issue appears to be premised on his acquittal in the Hickman County case. He appears to claim that, because he presented the same defense against similar allegations in the Hickman County trial and was acquitted, the trial court must have committed reversible error in this matter. However, the record for the prior trial is not before us. We cannot confirm the alleged similarities of the allegations, defense, or proceedings in general. The Hickman County case has no bearing on our decision herein. As the reviewing court, we consider only the record of proceedings before us. *Miles v. United Oil Co.*, 264 S.W.761, 762 (Ky. 1924).

4

trial court should have allowed Choate to testify despite Bowlin's decision not to disclose him as a potential witness prior to trial or during voir dire.[2] "[T]he determination of whether a surprise or unannounced witness may testify is within the sound discretion of the trial judge." *Peyton v. Commonwealth*, 253 S.W.3d 504, 512 (Ky. 2008) (citations omitted). In making such a decision, the trial judge should consider whether the party who failed to disclose the witnesses acted in bad faith, and whether the witness' testimony would prejudice the opposing party. *Id.*

Here, Bowlin accurately notes that, unlike in *Peyton* and *Collins v. Galbraith*, 494 S.W.2d 527, 530 (Ky. 1973), his attempt to call Choate as a witness violated neither an agreement between counsel nor an order of the court to disclose witnesses. In its order on reciprocal discovery, the trial court required Bowlin "to furnish to the Commonwealth a list of witnesses in the same manner and form as the Commonwealth is required to furnish to the Defendant prior to the trial . . ., **if the parties agree upon the exchange.**" (Emphasis added). No such agreement was made. The trial court also did not mandate disclosure of witnesses during voir dire. *See Peyton*, 253 S.W.3d at 512. Such disclosure is also not mandated by our rules. *See* RCr[3] 9.38. In light of these circumstances, we are left only to consider whether Bowlin was acting

---

[2] As argued by Bowlin, the trial court acknowledged that defense counsel mentioned calling "the same witness as the one in Hickman" in chambers just before the trial began.

[3] Kentucky Rules of Criminal Procedure.

5

in bad faith by disclosing Choate as a witness at the last minute, and whether the Commonwealth would have been prejudiced by allowing Bowlin to call him.

The trial court did not find Bowlin was acting in bad faith. We agree. Unlike the facts in *Peyton*, Bowlin was not seeking to delay his case. He sought to call the same witness he called in the Hickman County case. Defense counsel appeared to be operating under the assumption that, because she had been able to call Choate under similar circumstances in the prior case, she would be able to do the same here. While this assumption may have been unwise, it is not evidence of bad faith.

The Commonwealth does not claim it would have been prejudiced had the trial court allowed Choate's testimony. Considering that he had testified in the prior trial, it would be difficult to find prejudice. The Commonwealth knew of his existence as a potential witness and the contents of his prior testimony. Without evidence of bad faith or prejudice, we must find the trial court abused its discretion by barring Bowlin from calling Choate as a witness.

However, based on Choate's avowal testimony, this error can only be characterized as harmless.

> The test for harmlessness is whether the error substantially swayed the verdict. The inquiry is not simply whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or one is left in grave doubt, the conviction cannot stand.

*Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013) (internal quotation marks and citations omitted). This doctrine "promotes public respect for the

6

criminal process" by ensuring jury verdicts are not overturned based on "mere technicalities." *Hodge v. Commonwealth*, 17 S.W.3d 824, 848 (Ky. 2000) (citation omitted); *Jackson v. Commonwealth*, 187 S.W.3d 300, 304 (Ky. 2006) (citation omitted).

During his testimony by avowal, Choate spoke of how he became acquainted with Bowlin and S.H. He then testified in general and positive terms about Bowlin as a father and caregiver for the children. Finally, pertinent to Bowlin's argument regarding his defense, Choate testified to overhearing a conversation between S.H. and Hagerty in July 2019 or 2020 in which S.H. said

> she wanted to put [Bowlin] under any way she can and she stated that . . . at her house with the case worker setting right there and she said 'I wanna do whatever it takes to put him under' because she wanted her present husband to be the father of her child, not [Bowlin]. . . she wanted him to adopt [H.B. and L.B.]

The Commonwealth successfully objected to these statements as inadmissible hearsay. However, the trial court allowed Choate to repeat substantially similar statements later in his testimony, reasoning that he would give defense counsel latitude because the testimony was being given by avowal.[4]

Had Choate been allowed to testify at trial, the statements he claims S.H. made to Hagerty would have been inadmissible as hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the

---

[4] Choate also testified that S.H. introduced Hagerty to him as a friend. At trial, defense counsel did not question either S.H. or Hagerty about their alleged friendship.

trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE[5] 801(c). Unless a specific exception applies, hearsay is not admissible. KRE 802. Here, Bowlin would have offered Choate's testimony regarding S.H.'s statements for the truth of the matter asserted, namely, that she was willing to do whatever it took to keep Bowlin from having custody of the children. This testimony would clearly be inadmissible under KRE 802. No exception applies. Because Choate's testimony would have been largely inadmissible, there is no possibility it would have substantially impacted the outcome of the trial.

Next, Bowlin alleges the trial court prevented him from cross-examining S.H., C.H., and N.H. on the existence of a custody case involving himself and S.H. He argues S.H. wished to have custody of H.B. and L.B. and for her husband to adopt both children. He claims this desire motivated her to make her daughters fabricate the present allegations against him.

The right to cross-examine witnesses is essential to the Sixth Amendment Confrontation Clause. *Commonwealth v. Armstrong*, 556 S.W.3d 595, 602 (Ky. 2018) (footnote omitted). "Witness credibility is always at issue and relevant evidence which affects credibility should not be excluded." *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky. 1997) (citation omitted). Such evidence is that which gives "the witness reason to testify falsely during the trial at hand, *e.g.*, when the witness bears some animus toward, or is biased against, the defendant." *Beaty v. Commonwealth*, 125 S.W.3d 196, 206

---

[5] Kentucky Rules of Evidence.

(Ky. 2003), *abrogated on other grounds by Gray v. Commonwealth*, 480 S.W.3d 253 (Ky. 2016) (citations omitted).

However, "the trial court retains the discretion to set limitations on the scope and subject . . . of cross-examination." *Newcomb*, 410 S.W.3d at 85 (footnote omitted). The court may limit cross-examination based on "harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Id.* (footnote omitted). The trial court must apply limitations to cross-examination cautiously. *Maddox*, 955 S.W.2d at 720 (citations omitted). Such limitations cannot hinder the defendant's ability to develop a "reasonably complete picture of the witness' veracity, bias and motivation[.]" *Id.* at 721 (citation omitted).

Under Kentucky's evidentiary rules, a witness may testify to "matters of which he has personal knowledge[.]" *Ruiz v. Commonwealth*, 471 S.W.3d 675, 683 (Ky. 2015) (citations omitted); KRE 602. Furthermore, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence." KRE 401. This standard "is powerfully inclusionary and is met upon a showing of minimal probativeness." *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015) (footnote omitted).

Because Bowlin's defense was that the allegations against him were fabricated by S.H. and her daughters to help her gain custody of H.B. and L.B., defense counsel should have been allowed the opportunity to question the three witnesses about their personal knowledge of any custody issues or

9

proceedings. We will consider the trial court's handling of such questioning for each of the three witnesses.

First, N.H. testified she did not and was not asked to fabricate the allegations against Bowlin. During cross-examination, the following exchange occurred:

> Defense Counsel: Was there any issues with the children –custody issues –going on?
>
> N.H.: Not that I know of.

Later, on re-cross, questioning on the topic continued as follows:

> Defense Counsel: Is it your testimony here today that you had no knowledge that your mom was ever going to court over any kind of custody issues?
>
> N.H.: I knew that she was going to court, but she had not . . .
>
> Defense Counsel: So you did know that she had some custody issues going on?

The Commonwealth objected to relevance, the judge overruled the objection, and defense counsel was allowed to proceed. The exchange continued:

> Defense Counsel: So, you were aware that your mom had custody issues going on with Mr. Bowlin and going to court?
>
> N.H.: Yes, but they did not . . . talk about it to me.
>
> Defense Counsel: But you are aware that she was going to court?
>
> N.H.: Yes.

10

Counsel asked no further questions. The record proves the trial court did not prevent defense counsel from questioning N.H. about her knowledge of the custody issues between S.H. and Bowlin. Therefore, we can find no error.

Despite allowing counsel to question N.H. about the custody issues, the trial court barred the same line of questioning during Bowlin's cross-examination of C.H. Defense counsel similarly asked if C.H. had knowledge of any "custody issues relating to [H.B]."[6] The Commonwealth objected to relevance and the judge sustained the objection, telling defense counsel, "You're going to have to get it in the record somehow that there actually was a custody battle if there ever was." Counsel did not attempt to lay that foundation or ask any further questions. However, N.H.'s testimony established the existence of a court action. The trial court erred by preventing counsel from asking C.H. about her personal knowledge of those proceedings.

Finally, defense counsel attempted to question S.H. about the custody issues multiple times.[7] On cross-examination, when counsel asked S.H. about her relationship with L.B., the Commonwealth objected to the relevance of such testimony. During the bench conference, defense counsel agreed to move on from the question. Because defense counsel abandoned her line of questioning upon the Commonwealth's objection without the trial court ruling on issue,

_____

[6] Like N.H., C.H. also testified she was neither asked nor did she fabricate the allegations against Bowlin.

[7] S.H. was first called by the Commonwealth prior to N.H.'s and C.H.'s testimony. She was then recalled twice by Bowlin.

11

any argument regarding it is deemed waived on appeal. *Reg'l Jail Auth. v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989) (citation omitted).

Counsel then asked S.H. if she and Bowlin had ever had any disagreements about custody of H.B. S.H. denied any such disagreements. Counsel did not challenge her denial or question her about the existence of a court action regarding custody of H.B. or L.B. Like her cross-examination of N.H., defense counsel was given the opportunity to continue to question S.H. but chose not to do so. The trial court committed no error.

After the close of the Commonwealth's case-in-chief, defense counsel recalled S.H. twice to question her about the custody issues. First, counsel asked, "Can you give the jury some kind of . . . brief explanation of . . . after you all split up, what it looked like –the custody arrangement between . . . you and Mr. Bowlin with regard to [H.B.]?" The Commonwealth again objected to relevance. During the bench conference, the judge asked defense counsel if either parent had filed a custody action and, if so, whether counsel had copies of the record from the case. Counsel said an action had been filed in either 2019 or 2020 but admitted she did not have copies of any documents. The judge sustained the motion because counsel had not laid foundation proving the custody case existed. The judge reasoned,

> If there're [sic] court documents, then you have a reasonable basis to ask her. You have a right, on the defendant's part, to establish motive if you can connect the two. But you've got to have a basis to start. You can't just ask the questions. . . . If there was a court action in this court, you don't have copies of it.

12

Without documentation of the custody action, defense counsel abandoned this line of questioning. Her final question was whether S.H. had discussed the allegations of sexual abuse with either of her daughters. S.H. said she had not.

The trial court erroneously prevented defense counsel from inquiring about S.H.'s personal knowledge of her custody arrangements and/or court action involving her own child. There exists in Kentucky law no requirement that counsel must present a witness with copies of documents to ask her about a lawsuit to which she is a party. Furthermore, considering Bowlin's defense theory, this line of questioning easily clears the very low bar for relevance. However, defense counsel also did not attempt to lay any foundation regarding the existence of a court action. For example, she did not ask S.H. if she had ever filed a custody action regarding H.B. or whether she had ever been to court in such an action. These oversights are not attributable to the trial court.

Defense counsel then recalled S.H. for the second time to ask S.H. about meeting with Hagerty in her home. S.H. testified that Hagerty came to her home on one occasion in 2021 in her professional capacity as a caseworker to discuss the allegations against Bowlin. Counsel asked, "Did you ever say . . . what can I do . . . to make sure that Mr. Bowlin never sees these children again?" As S.H. denied asking the question, the Commonwealth objected to relevance. The judge again sustained the objection. Defense counsel finally asked S.H. if she asked her daughters to make up the allegations so that she could gain an advantage. S.H. denied doing so.

13

Defense counsel argued this question was based on the testimony she expected to elicit from Choate regarding the conversation he overheard during July 2019 or 2020. "Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them[.]" KRE 613 (a). Here, defense counsel was questioning S.H. about a conversation she had with Hagerty after N.H. and C.H. disclosed the allegations in 2021, at least a year after the conversation Choate claimed to have overheard. Counsel never questioned S.H. about a conversation in 2019 or 2020 for which Choate was present. Therefore, the trial court committed no error by sustaining the Commonwealth's objection to statements made during a conversation that occurred after the allegations against Bowlin were made.

As detailed above, many of the errors claimed by Bowlin were not made by the trial court but rather resulted from defense counsel's failure to properly establish a foundation regarding the alleged custody issues or fully explore them during cross-examination when given the opportunity.

Although the trial court erred by preventing Bowlin from questioning C.H. and S.H. about their personal knowledge of any custody issues, those errors were harmless. When a defendant complains of a confrontation clause error, "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would

14

obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Faughn v. Commonwealth*, 694 S.W.3d 339, 347 (Ky. 2024) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988)).

Despite the trial court's errors in limiting defense counsel's questioning of S.H. and C.H., the remaining evidence against Bowlin is sufficient to support his conviction. Both victims gave detailed testimony about Bowlin's actions. S.H. denied even discussing the allegations with her daughters. Both victims testified they had not been asked to lie or fabricate the allegations. Through N.H.'s testimony, the jury had knowledge of the existence of the custody action. The connection between such an action and the allegations of the two teenage victims was tenuous, at best. In light of the remaining evidence, there is no possibility that additional questioning of S.H. and C.H. would have substantially swayed the outcome of the trial. Therefore, reversal is not mandated.

## 2. N.H.'s brief victim impact testimony during the guilt phase does not amount to palpable error.

Bowlin claims the Commonwealth impermissibly elicited victim impact testimony from N.H. during the guilt phase of the trial. He concedes this issue is unpreserved and requests review for palpable error under RCr 10.26. "To establish palpable error, [an] [a]ppellant must show the probability of a different result or error so fundamental as to threaten his entitlement to due process of law." *Huddleston v. Commonwealth*, 542 S.W.3d 237, 245 (Ky. 2018) (internal quotation marks and citation omitted). We must decide "whether the

defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* (internal quotation marks and citation omitted).

During N.H.'s testimony, the Commonwealth initiated the following exchange:

> CW: Have you enjoyed preparing for this trial?
>
> N.H.: No.
>
> CW: Have you, . . . well, you said you were trying to go to . . . college, right? You're going to Bethel, right?
>
> N.H.: Yes.
>
> CW: Do you have a scholarship there?
>
> N.H.: I don't.
>
> CW: That's tough. I remember how that was, too. . . . Have you had to put off starting college because of this?
>
> N.H.: I did.

In its closing argument, the Commonwealth referred to this exchange by saying:

> I asked [C.H.] and [N.H.] both, has this been fun for you? Have you enjoyed this experience? Has this impacted your life negatively, having to prepare for trial and go over this over and over and over again? [N.H.] had to put off starting college. She already had a place she wanted to go to. She had everything set up, but she had to put it off because she had to be here for this. Focused on this trial. Focused on doing the right thing.

Bowlin cites to *Alderson v. Commonwealth*, 670 S.W.3d 884, 894 (Ky. 2023), to argue N.H.'s testimony that she delayed attending college because of

16

the trial "established the terrible consequences of [his] actions on her life going forward and was likely to arouse the jurors' sympathy." This matter is easily distinguished from *Alderson*.

Therein, Alderson was convicted of two counts of rape in the first degree and two counts of sexual abuse in the first degree involving three victims. *Id.* at 890. During each of the three victims' testimony, the Commonwealth asked about how the defendant's actions had affected their lives going forward. *Id.* at 891. The first victim gave a lengthy answer describing having to take medication for sleep, experiencing night terrors and flashbacks, feeling uncomfortable around male relatives, and changes at school. *Id.* The second victim gave a detailed answer about depression, loss of trust, discomfort, and her grades suffering as a result. *Id.* The third victim testified, "It's made me really uncomfortable around a lot of people. I've been really scared of a lot of people since then." *Id.* at 892. The Commonwealth then referenced the victims' testimony in its guilt phase closing argument. *Id.*

On appeal, this Court held the victims' testimony deprived Alderson of a fair trial and constituted palpable error. *Id.* The court acknowledged that this issue involves "the intersection if three different rules: (1) victim-impact evidence is typically inadmissible until the penalty phase of the trial; (2) victim background evidence is generally admissible; and (3) a witness can generally bolster her own testimony after her credibility has been attacked." *Id.* at 893 (citations omitted). Victim impact testimony can be distinguished from background testimony by determining "whether the evidence is aimed primarily

17

at appealing to the jurors' sympathies or providing an understanding of the nature of the crime[.]" *Id.* (internal quotation marks and citations omitted). During the guilt phase, the trial court should not allow "[h]ighly inflammatory" evidence regarding the "terrible loss" a victim suffered when the evidence has "little to no probative value." *Id.* (citation omitted). The Court characterized the three victims' testimony as "repeated and extensive" and highly inflammatory with no justification as testimony to their backgrounds or credibility. *Id.* at 895.

By contrast, admission of N.H.'s testimony was not palpable error. Her testimony amounted to six words. Unlike the victims in *Alderson*, she did not give detailed testimony about long-term effects and changes to her everyday life. Her testimony was neither highly inflammatory nor repeated and extensive. While we agree with Bowlin that her testimony did not help the jury understand the nature of the crimes, we cannot find such brief testimony affected his substantial rights. Therefore, even if her answers amounted to victim-impact testimony rather than testimony regarding her background or credibility, its admission was not palpable error.

Furthermore, the Commonwealth's reference to N.H.'s testimony during its guilt phase closing argument is not victim impact testimony. "Closing arguments are not evidence, and prosecutors are given wide latitude during closing arguments." *Brown v. Commonwealth,* 553 S.W.3d 826, 837 (Ky. 2018) (internal quotation marks and footnote omitted). Because of this, we review a prosecutor's comments for misconduct and will reverse only if the misconduct

18

is "flagrant." *Id.* (footnote omitted). Flagrancy is determined by considering the following factors: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.* at 838 (quoting *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016)).

In this matter, the statement was deliberately made but not "extensively discussed." *Id.* While N.H.'s testimony and the Commonwealth's statements were likely meant to sway jurors' sympathies, due to the brevity of both, we are not convinced of any probability that the jury was misled. While this case can be described as a "he said, she said," in light of the detailed and compelling testimony from N.H. and C.H., it is difficult to characterize the Commonwealth's statement as prejudicial. Therefore, while the Commonwealth's statement may have been inappropriate, any misconduct was not flagrant.

### 3. Bowlin was not deprived of a unanimous verdict.

Bowlin next argues two of the jury instructions on sexual abuse in the first degree deprived him of a unanimous verdict. Because he did not preserve this issue at trial, he now requests review for palpable error under RCr 10.26.

Specifically, Bowlin argues Instructions No. 7 and No. 8 are confusing and vague in their description of the locations of each instance of sexual contact. Instruction No. 7 reads, in relevant part:

> You, the Jury, will find the Defendant, Aaron Bowlin,
> guilty under this Instruction if, and only if, you believe

19

from the evidence beyond a reasonable doubt all of the following:

> A. That in this county in or about the year of 2013, before the finding of the Indictment herein, the Defendant, Aaron Bowlin, subjected C.H. to sexual contact **in the bathroom of their home in the city of Hickman.**
> . . .

(Emphasis added). Instruction No. 8 reads, in relevant part:

> You, the Jury, will find the Defendant, Aaron Bowlin, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

> A. That in this county in or about the year of 2013, before the finding of the Indictment herein, the Defendant, Aaron Bowlin, subjected C.H. to sexual contact **at the home on Terrace Dr., where they were staying.**
> . . .

(Emphasis added).

When Bowlin and S.H. were in a relationship, they lived in two locations in Hickman, Kentucky, Bowlin's step-grandmother's home on Terrace Drive and a trailer. He argues that because both residences were in Hickman, jurors could have believed both instructions referred to the Terrace Drive home and there was no evidence of sexual contact in a bathroom at that residence. He claims Instruction No. 7 should have referred to "the bathroom in the tan trailer" and Instruction No. 8 should have referred to "the bedroom of Bowlin's step-grandmother's house on Terrace Drive." Appellant's Brief at 33.

Both the United States' and Kentucky constitutions guarantee a defendant's right to a unanimous verdict in a criminal trial. U.S. CONST.

20

amend. VI, XIV; KY. CONST. § 7; *Capstraw v. Commonwealth*, 641 S.W.3d 148, 158 (Ky. 2022). "[T]he Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense." *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009) (citation omitted). The instructions must make it clear that the jury not only found the defendant committed the offense, "but also exactly which incident they all believed occurred [and voted for.]" *Id.* at 696 (citation omitted). Otherwise, the defendant is denied a unanimous verdict and "cannot rationally challenge the sufficiency of the evidence on appeal." *Id.* (citation omitted).

In *Harp v. Commonwealth*, 266 S.W.3d 813, 817 (Ky. 2008), the trial court used identical language to instruct the jury on seven separate charged offenses. Each instruction read, in relevant part:

> You will find the defendant, Wilbert Hiatt Harp, guilty under this Instruction if you believe from the evidence beyond a reasonable doubt, all of the following:
>
> (a) That in this county, between the 1st day of December 2003 and the 1st day of February 2006, the defendant subjected [B.B.] to sexual contact[.]
> . . .

*Id.* This Court found the use of identical language in the seven instructions was erroneous and instructed the bench and bar that

> in a case involving multiple counts of the same offense, a trial court is obliged to include some sort of identifying characteristic in each instruction that will require the jury to determine whether it is satisfied from the evidence the existence of facts proving each of the

21

separately       charged       offenses       occurred.

*Id.* at 818. At a minimum, the court must include "some basic evidentiary identification" in each instruction to differentiate offenses. *Id.* at 819.

The instructions in this matter are distinguishable from those in *Harp.* At trial, C.H. testified in detail to each instance of sexual abuse.[8] First, she described an encounter in the bathroom of the family's trailer. She then testified to an incident in the bedroom of the Terrace Drive house while she was sleeping in the same bed as Bowlin. Based on this testimony, the trial court used sufficiently descriptive language to distinguish the two offenses while also adhering to the longstanding principle of "bare bones" instructions. *Id.* In her testimony, C.H. described only a single encounter in a bathroom and only a single encounter inside the Terrace Drive home. We are unconvinced by Bowlin's claim that the instructions for these offenses confused jurors. They included sufficient identifying characteristics to distinguish each offense from the other. Therefore, Bowlin was not deprived of a unanimous verdict.

---

[8] Although not at issue herein, C.H. testified to a third encounter in the woods near the Terrace Drive house. In Instruction No. 9, the trial court distinguished this offense by instructing the jury as follows:

> You, the Jury, will find the Defendant, Aaron Bowlin, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> A. That in this county in or about the year of 2013, before the finding of the Indictment herein, the Defendant, Aaron Bowlin, subjected C.H. to sexual contact **in the woods adjacent to Terrace Dr., Hickman, KY**[.]
> . . .

(Emphasis added).

22

## 4. The trial court acted within its jurisdiction when it imposed incarceration fees at sentencing.

Finally, Bowlin argues the trial court was without jurisdiction to impose jail fees in its sentencing order because of the General Assembly's 2022 amendment of KRS[9] 441.265. He did not preserve this issue at trial. However, "because sentencing is jurisdictional, a failure to object cannot waive sentencing errors, which may properly be raised for the first time on appeal." *Alderson*, 670 S.W.3d at 902 (citation omitted).

In 2021, this Court decided *Jones v. Clark Cty.*, 635 S.W.3d 54 (Ky. 2021). Jones was incarcerated for fourteen months in county jail. Upon his release, he was presented with a bill from the Clark County Detention Center ("CCDC") for $4,008.85 in incarceration fees. *Id.* at 56. Shortly thereafter, the charges against him were dismissed without prejudice. *Id.* Jones filed suit against the CCDC and the jailer alleging violations of the Kentucky Constitution and arguing "KRS 441.265 did not permit the CCDC to bill a former prisoner for the cost of his confinement when all charges against the prisoner had been dismissed." *Id.* The trial court granted summary judgment in favor of the county, finding that KRS 441.265 allowed the CCDC to bill and collect the fees. *Id.* at 56-57.

At the time, KRS 441.265(1) read "[a] prisoner in a county jail shall be required **by the sentencing court** to reimburse the county for expenses incurred by reason of the prisoner's confinement as set out in this section,

---

[9] Kentucky Revised Statutes.

23

except for good cause shown." (emphasis added). On discretionary review, this Court cited to related statutory provisions, KRS 532.352 and KRS 532.358, which also refer to "the sentencing court" to find "the sentencing court is the only entity able to order the reimbursement and billing of incarceration fees, not the county jail." *Jones*, 635 S.W.3d at 59. This Court held CCDC violated KRS 441.265 because it acted without the sentencing court first ordering the reimbursement of fees. *Id.* at 60. In Jones' case, no such order would be entered because the charges against him were dismissed. *Id.*

The following year, the General Assembly amended KRS 441.265(1) to remove the reference to the "sentencing court." The statute now reads "[a] prisoner in a county jail shall be required **beginning from the prisoner's booking date** to reimburse the county for expenses incurred by reason of the prisoner's confinement as set out in this section, except for good cause shown." KRS 441.265(1)(a) (emphasis added). Bowlin argues this amendment removed the statutory authority for sentencing courts to order reimbursement of jail fees at sentencing. This is a misreading of the statutory scheme as a whole.

The General Assembly's amendment of the KRS 441.265 did not remove reimbursement of incarceration fees from trial courts' jurisdiction. Although the General Assembly removed the reference to the "sentencing court" from KRS 441.265, it did not do the same for KRS 532.352 or KRS 532.358. Under KRS 532.352(1), "[t]he sentencing court may order a person who is sentenced to a term of incarceration . . . to reimburse the state or local government for the costs of his incarceration." The statute also requires reimbursement to be paid

24

to the jailer "in the amount specified by written order of the court." KRS 532.352(3). Under KRS 532.358, prisoners are required to reimburse the state or local government for the cost of incarceration "within the time and amount designated by the sentencing court[.]"

When this Court engages in statutory interpretation, we "should not, if possible, adopt a construction that renders a provision meaningless or ineffectual or interpret a provision in a manner that brings about an absurd or unreasonable result." *Schoenbachler v. Minyard,* 110 S.W.3d 776, 783 (Ky. 2003) (footnotes omitted). We presume "the legislature did not intend an absurd result" when it enacted or amended a statute. *Cosby v. Commonwealth,* 147 S.W.3d 56, 59 (Ky. 2004) (citation omitted). Were we to interpret the removal of the reference to the sentencing court in KRS 441.265(1)(a) to entirely remove reimbursement of incarceration fees from that court's jurisdiction, KRS 532.352 and KRS 532.358 would be rendered ineffectual. We cannot find that the General Assembly intended such an absurd result.

Because the trial court had jurisdiction to order reimbursement of incarceration fees, we find no error.

### CONCLUSION

Based on the foregoing, the judgment of the Fulton Circuit Court is affirmed.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., dissents by separate opinion.

25

THOMPSON, J., DISSENTING I write separately to dissent from the majority's resolution of Aaron Bowlin's first argument. Bowling argues he was denied his right to present a defense when he was excluded from calling Barak Choate as a witness and from questioning S.H., N.H., and C.H. about their personal knowledge of any custody issues between S.H. and Bowling.

I agree with the majority opinion's analysis that the trial court abused its discretion in barring the defense from calling Choate as a witness and prohibiting the defense from questioning S.H. and C.H. about their personal knowledge of any custody issues or proceedings. I vehemently disagree with the majority's ultimate resolution that "[a]ny error by the trial court regarding admission of evidence relating to Bowlin's defense was harmless."

Reversal is warranted here because by prohibiting Choate from testifying and excluding such questions regarding a custody dispute, Aaron Bowlin was denied his constitutional right to present his defense.

> [O]ne of the most fundamental aspects of our criminal justice system is the defendant's right to present her own defense. We have an adversary system of justice. The prosecutor is not there as an adjunct to the court to marshal the evidence, as in an inquisitorial system, thereby leaving the accused to stand by at his mercy. The defendant is allowed to actively defend the case, which includes the right to put on evidence.

*Daugherty v. Commonwealth*, 467 S.W.3d 222, 234 (Ky. 2015).

As further explained in *California v. Trombetta*, 467 U.S. 479, 485 (1984): "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal

26

defendants be afforded a meaningful opportunity to present a complete defense." Similarly, in *Washington v. Texas*, 388 U.S. 14, 19 (1967), the United States Supreme Court stated "the right to present a defense," which includes "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies[,] . . . is a fundamental element of due process of law." Our Court has repeatedly reaffirmed that "all criminal defendants have a due process right to present a defense[.]" *Breazeale v. Commonwealth*, 600 S.W.3d 682, 691 (Ky. 2020).

While "[w]e show great deference to a trial court's evidentiary rulings and reverse only upon a finding of an abuse of discretion[,]" *Gray v. Commonwealth*, 480 S.W.3d 253, 266–67 (Ky. 2016), the majority found that an abuse of discretion occurred in excluding this evidence. The majority then delved into an ordinary harmless error analysis. That was inappropriate because if a defendant has been denied his Sixth Amendment right to present a defense, that is an error with a constitutional dimension and requires a different analysis.

As was the case in *Daugherty*, the statements which the trial court wrongfully excluded "were necessary to present a full picture of [Bowlin's] version of what happened" and were necessary to provide context for what the defense believed occurred. *Daugherty*, 467 S.W.3d at 235. Therefore, they implicated his constitutional right to present his defense.

> [When] errors . . . have a constitutional dimension, the standard for finding the errors to be harmless is much higher. "[B]efore a federal constitutional error can be held harmless, the court must

27

> be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24 (1967); *see also Brecht v. Abrahamson,* 507 U.S. 619, 622 (1993) ("[T]he standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.' "). This requires "prov[ing] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24. And "[t]he State bears the burden of proving that an error passes muster under this standard." *Brecht,* 507 U.S. at 630.

*Id.* at 237 (parallel internal citations omitted).

It cannot be harmless error beyond a reasonable doubt to prohibit a defendant from presenting his defense where there is wholly relevant and admissible evidence to support it, as was the case here. I am convinced that Bowlin was utterly denied his right to present his defense, and this resulted in a denial of his due process rights, rendering the trial fundamentally unfair and requiring a reversal for a new trial.

Bowlin properly points out that when he raised his defense in Hickman County—that there was a custody dispute between Bowling and S.H. which provided a motivation for S.H. to get N.H. and C.H. to lie and raise allegations of sexual abuse against him many years after the actions allegedly occurred— he was acquitted of committing similar crimes involving the same children. While I agree that we cannot truly consider what occurred in the trial in another county as that record is not before us, it is still a pertinent fact which supports his assertion that being denied such a defense prejudiced him.

It is also significant that the same prosecutor and judge participated in that case and were well-familiar with what the defense strategy would be in

28

this case. The Commonwealth's objections and the trial court's sustaining of those objections utterly blocked such a defense from again being successfully presented to a jury.

The majority examines the effect of the trial court's rulings individually and faults defense counsel for failing to lay a foundation for asking S.H. about a custody battle and abandoning her position that she was entitled to ask about custody issues. The majority opinion states that defense counsel failed in her questioning of S.H. by not attempting to lay any foundation regarding the existence of a court action regarding custody. The majority opines "[t]hese oversights are not attributable to the trial court."

On the contrary, every time the defense attempted to lay a foundation to establish that there was any dispute between Bowlin and S.H. over custody or to establish the required basis for admitting S.H.'s previous inconsistent statements regarding such dispute, the Commonwealth objected, typically based on relevance, and the trial court sustained those objections. These included those questions asked on cross-examination of S.H., on cross-examination of N.H., on cross-examination of C.H., when recalling S.H. twice during the defense case in chief, when calling Andrea Haggerty, and when requesting to call Choate. Objections were raised any time the defense tried to ask the witnesses any questions related to custody, including: (1) the existence of a custody action, (2) the existence of any dispute about custody, (3) the existence of any conversations relating to custody, (4) S.H. taking an interest in the child Bowlin shared with another woman, (5) S.H. expressing interest in

29

having custody of their shared child and the child Bowlin shared with another woman, and (6) S.H.'s expressed wish to have her current husband adopt their shared child.

The defense was blocked at every turn, with perhaps a dozen objections to relevance being sustained after lengthy conferences with the trial court which repeatedly limited the defense counsel's ability to address the topics which were key to establishing Bowlin's defense, even when she followed the trial court's suggestions for possibly establishing a basis for asking these questions.

Defense counsel was left in the unenviable and nearly impossible position of trying to establish that S.H. had a motive to get her children to lie about Bowlin molesting them in order to secure custody of the child she shared with Bowlin and the child Bowlin shared with another woman, without asking any questions regarding custody.

While N.H. was permitted to answer as to whether there was a custody dispute, C.H. was not, and once S.H. stated there were no disagreements over custody, no further questions on custody were permitted to be asked of her in any other examination of her, even the two times that the defense called S.H. during its case in chief. Given these rulings, the trial court made it abundantly clear that defense counsel would not be permitted to ask any further questions relating to custody of Bowlin's and S.H.'s shared child, or any questions relating to any custody disputes regarding Bowlin's child with another woman.

It did not matter how those questions were phrased; they were not going to be permitted.

The trial court's justification for this ruling was that counsel could not ask such questions because counsel had failed to provide copies of any court filings to establish there was a custody case. I agree with the majority opinion that no such proof was required, and an actual custody case did not have to be established. It was enough that defense counsel had a good faith belief that there was a custody issue.

Defense counsel explained the basis of that belief, which was derived from S.H.'s testimony in the trial in Hickman County. As the same presiding judge and the Assistant Commonwealth Attorney were at both trials, they did not have to rely on the defense attorney's recollection as to this testimony because they were present also. Defense counsel also stated her belief that district court actions regarding custody had been filed in 2019 and 2020. Defense counsel additionally noted that N.H. acknowledged that her mother was going to court regarding custody issues, but stated her mother did not talk to her about these issues.

Counsel did everything she reasonably could to find a way to ask S.H. whether there was any dispute over custody at any time, even asking what their custody agreement looked like. She cannot be faulted for obeying the trial court's repeatedly established limits and ultimately moving on, asking the only questions that the trial court would permit her to ask, rather than continuing to disrespect the trial court's repeated rulings prohibiting such questions.

31

Defense counsel clearly explained her reason for asking about custody, that she wanted to establish a basis to allow Choate to testify regarding the conversation he had with S.H. and overheard between S.H. and Haggerty, regarding custody. She also explained that this would serve as impeachment testimony about which S.H. could be questioned.

In order to have Choate testify regarding these conversations, S.H. had to first be questioned about her prior statements. Kentucky Rules of Evidence (KRE) 613(a) provides the method for questioning a witness as to prior statements:

> Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it.

Our Court noted that *Cole v. State,* 65 Tenn. 239 (1873), provides the best rationale behind this process:

> Where it is intended to impeach the witness by proving that he made statements out of court contrary to what he has testified in court, the witness should be asked whether he said or declared that which it is proposed to prove by the impeaching witness, that he did say or declare, and the time and place and person to whom the declaration was made should be stated in the question.

> The object of the question is to contradict him, and it is but fair to the witness to refresh his recollection as to the declaration or words used and proposed to be proved, and also by stating time, place and other circumstances calculated to refresh his memory.

*Noel v. Commonwealth,* 76 S.W.3d 923, 930 (Ky. 2002), *overruled on other grounds* by *Mason v. Commonwealth,* 559 S.W.3d 337, 341–42 (Ky. 2018) (quoting *Cole,* 65 Tenn. at 241 (citations omitted)).

It is clear that defense counsel was fully prohibited from questioning S.H. about her prior statements to Haggerty and Choate. Without being allowed to ask such questions, the defense could not comply with the requirements of KRE 613 so that the defense could then call Choate to impeach S.H. based on her prior inconsistent statements.

Defense counsel repeatedly tried to question S.H. about her prior statements but could not get anywhere close to asking such questions, as any questions she made regarding any custody dispute (which would have been preliminary to asking questions about S.H.'s specific prior statements about such dispute), were barred on the basis of relevance.

Following being prohibited from asking such preliminary questions on her cross examination of S.H., defense counsel tried a further time to question S.H., by recalling S.H. during the defense case in chief. The second time defense counsel recalled S.H., defense counsel asked about the conversation S.H. had with Haggerty, and if S.H. had ever asked Haggerty what she could do to make sure Bowlin never saw the children again.

The Commonwealth again objected, arguing this question was not relevant, while the defense counsel asserted it was relevant to show motive. While the trial court acknowledged that the defense was entitled to show motive, the trial court denied that S.H. could properly be questioned about this due to the lack of any information that S.H. induced the children to come forward. Defense counsel explained that Choate would provide such proof, and related that he would testify that S.H. made such statements prior to when the

33

accusations came out, noting that this was her same theory in the Hickman County case, and thus was relevant. The trial court suggested that perhaps Haggerty could be recalled to establish this, but returned again to the fact that the defense counsel did not have any court documents to establish that there was a custody dispute, and sustained the Commonwealth's objection.

The majority opinion faults the defense counsel for, after this objection was sustained, "never questioning S.H. about a conversation in 2019 or 2020 for which Choate was present" and concludes that given this lack "the trial court committed no error by sustaining the Commonwealth's objection to statements made during a conversation which occurred after the allegations against Bowlin were made."

The majority opinion assumes that "defense counsel was questioning S.H. about a conversation she had with Hagerty after N.H. and C.H. disclosed the allegations in 2021, at least a year after the conversation that Choate claims to have overheard." I disagree that the question necessarily related to a conversation that occurred in 2021, but even if it did, the defense counsel was also thereby prohibited from asking about any earlier conversations by the trial court's ruling on the objection as to that question.

In examining this line of questioning, while the defense counsel discussed social services being at S.H.'s house after she learned about the

allegations, the actual question asked of S.H. was not tied to any dates. The

questioning[10] was as follows:

> Defense: Was there ever a conversation that you had with Andrea Haggerty . . . Did you have a conversation in general? Was she ever at your home?
>
> S.H.: She was.
>
> Defense: Okay. Did you ever make a statement . . . . Did you ever say that "what can I do" something to the effect of "what can I do to make sure that Mr. Bowlin never sees these children again?"

An objection was immediately lodged, and like all others, sustained.

Even if it could be implied that such question related to when social services became involved in 2021, despite the wording of "did you ever," I submit that the defense counsel was never going to be able to ask such a question with more specificity regarding the conversation taking place in front of Choate in 2019 or 2020, where the trial court had already sustained an objection to her asking about that conversation without a specific date. We have no way of knowing whether upon such denial, the defense counsel might not have proceeded to ask more specifically if she made any such statement to Haggerty in 2019 or 2020, when Choate was present, and then proceed to ask about the conversation that S.H. had with Choate directly regarding these matters.

---

[10] For clarity, I have omitted S.H.'s question back to defense counsel, as well as the Commonwealth's objection to defense counsel asking an additional question which was overruled.

35

The trial court further stated that defense counsel needed to show that one of the girls said that their mother told them to lie and in the absence of that there was simply no proof of any fabrication, and rejected that Choate could establish that there was a motive to lie, while defense counsel argued that his testimony would allow the jury to infer that "doing anything" to prevent Bowlin from having custody would include having her children lie. The trial court sustained the Commonwealth's objection to the defense being allowed to call Choate.

Defense counsel then called Haggerty and asked her if she had any occasion to go to the girls' house and how many times she had gone there. Haggerty answered that as far as this investigation, she had gone over to the house one time, on June 8, 2021, and only spoke with S.H. Defense counsel asked "Did she [S.H.] ever make any statements with regard to Mr. Bowlin and keeping the children away from him?" The Commonwealth again objected to defense counsel trying to "backdoor" get the custody issue before the jury without having Choate testify. This objection was sustained, with the trial court stating that defense could only ask open-ended questions concerning S.H.'s relationship with Bowlin.

Again, while this question could be interpreted to be asking about a conversation in 2021, the question itself was worded in terms of "did she ever" and if it was specific to 2021, the sustaining of the objection prevented the defense counsel from then asking whether Haggerty had ever met with S.H. at

36

her house prior to the Cabinet's involvement, and whether S.H. made such a statement in front of Choate in 2019 or 2020.

When defense counsel resumed questioning Haggerty, she complied with the trial court's requirement that she only ask Haggerty open ended questions. Defense counsel asked if Haggerty and S.H. had ever had any conversations about Bowlin, Haggerty stated she advised S.H. not to let Bowlin be around the children. When defense counsel asked if S.H. made any other statements about Bowlin, the Commonwealth made a hearsay objection which was sustained. I submit that this question, had it been allowed to be answered, would have been a prelude to asking a more specific question about the conversation before Choate.

Therefore, I strongly disagree with the majority opinion that "many of the errors alleged by Bowlin were not committed by the trial court but are attributable to defense counsel for failing to properly lay foundation regarding the alleged custody issues or fully explore them on cross-examination when given the opportunity to do so." I submit that the trial court entirely barred defense counsel from exploring such issues.

From examining defense counsel's repeated attempts to examine S.H. and Haggerty about their interactions, it is evident that the trial court would not permit defense counsel to ask any specific questions about S.H.'s and Haggerty's prior interactions from either of them which related to a discussion about S.H. seeking custody of her shared child with Bowlin or attempting to block his access. This is fully attributable to the trial court's rulings rather

37

than the defense counsel's failures to adequately question S.H. The trial court's incorrect rulings wholly prevented defense counsel from complying with the requirements of KRE 613 so that she could then have Choate testify to impeach S.H. regarding her prior inconsistent statements.

During Choate's avowal testimony, he testified about two separate conversations, one that he had directly with S.H., and another that he overheard between S.H. and Haggerty. Choate testified that on a Halloween night S.H. brought the children trick-or-treating and told him that she wanted her new husband to become the father of the child she shared with Bowlin and that she also wanted custody of Bowlin's child who he had with another woman.

Choate testified that in the later part of July of either 2019 or 2020, he came to S.H.'s house to pick up his X-box that she had borrowed. Haggerty was present and S.H. introduced her as her friend. Choate explained he did not know that Haggerty was a caseworker until later and had no reason to think she was there in her capacity as a caseworker, as there was no case at the time. He explained that S.H. stated they had been friends since she was a Brownie Den Mother, and they were friends in Clinton.

Choate testified that S.H. told Haggerty that she wanted to do whatever she could to "put him [meaning Bowlin] under." Based on Choate's other conversation with S.H. about custody, he interpreted this as S.H. meaning that she wanted Bowlin out of their lives so that her current husband could be the father of the child she shared with Bowlin.

38

The majority opinion concludes that "[h]ad Choate been allowed to testify at trial, the statements he claims S.H. made to Hagerty would have been inadmissible as hearsay" because "[n]o exception applies." This, too, is incorrect.

If defense counsel had been allowed to ask S.H. about her prior statements and she had denied making them, Choate's testimony about these prior inconsistent statements would not simply be impeachment evidence but would also be admissible as substantive evidence under the *Jett* rule[11] as codified by KRE 801A. *Shepherd v. Commonwealth*, 251 S.W.3d 309, 322 (Ky. 2008); *Thurman v. Commonwealth*, 975 S.W.2d 888, 893–94 (Ky. 1998); *Porter v. Commonwealth*, 892 S.W.2d 594, 596 (Ky. 1995).

KRE 801A(a) provides in relevant part:

Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is:

(1) Inconsistent with the declarant's testimony[.]

As explained in *Thurman*, even if a party's primary purpose in calling a witness was to impeach that witness with her prior inconsistent statements, "the evidence contained in those statements was not 'otherwise inadmissible.'" *Thurman*, 975 S.W.2d at 894 (quoting *United States v. Morlang,* 531 F.2d 183 (4th Cir. 1975)). However, I will not assume that the defense called S.H. only to

_____

[11] *Jett v. Commonwealth*, 436 S.W.2d 788 (Ky. 1969). *See Askew v. Commonwealth*, 768 S.W.2d 51, 56 (Ky. 1989) (explaining the *Jett* rule).

39

impeach her so that her prior inconsistent statements could be admitted through Choate; there was also the possibility that S.H. if asked the proper questions may have testified that in fact she had made statements regarding wanting Bowlin out of the way so that she could gain custody of their shared child and also his other child.

Had the defense been able to appropriately question S.H., thus providing the basis for offering Choate's testimony regarding S.H.'s prior inconsistent statements, such statements would not have constituted hearsay and could have properly been used to impeach her trial testimony and as substantive evidence. Therefore, I disagree with the majority that "[b]ecause Choate's testimony would have been largely inadmissible, there is no possibility it would have substantively impacted the outcome of the trial."

When considered together, the combination of the trial court's rulings preventing defense counsel from asking S.H. appropriate questions regarding her motive to have the children lie and preventing defense counsel from establishing the predicate for S.H. to deny that such conversations took place, thus allowing Choate to testify about S.H.'s prior inconsistent statements, constituted prejudicial error. Such prohibitions barred Bowlin from being able to present his defense and left the jury with no explanation of why the victims N.H. and C.H. and their mother S.H. would have any motivation to lie.

The prejudice resulting from these rulings was evident during the closing arguments. Defense counsel was left having to argue that the jury needed to read between the lines to figure out why the girls had a reason to lie, and to try

40

to form reasonable doubt out of the delay in their reporting and the minor inconsistencies in their testimony.

The Commonwealth, in contrast, was able to argue (based on the trial court's rulings fully excluding that line of questioning and Choate from testifying) that the defense could not provide **any** reason for why the girls made it up, they had no possible reason to lie, there was no one who could possibly benefit from them lying.

Bowlin's Sixth Amendment right to present his defense was thereby violated by the trial court's incorrect prohibitions of certain lines of questioning by defense counsel and the exclusion of Choate. This resulted in a fundamentally unfair process to Bowlin in which the credibility and motives of S.H., N.H., and C.H. could not be examined. These errors were not harmless beyond a reasonable doubt. Therefore, I would reverse for a new trial and allow defense counsel to properly inquire into such matters. It is appropriate to let the jury resolve all issues of fact, including making credibility determinations as to the witnesses' veracity after hearing appropriate impeachment and substantive evidence regarding prior inconsistent statements which could provide a motive for the witnesses to lie. Such determinations were necessary to resolve whether Bowlin was guilty beyond a reasonable doubt.

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General